**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                              )
KENNETH C. AMES, JR.,         )
                              )
          Plaintiff,          )
                              )
     v.                       )    Civil Action No. 00-3116 (RWR)(DAR)
                              )
YELLOW CAB OF D.C., INC.,     )
     et al.,                  )
                              )
          Defendants.         )
_____       )
```

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kenneth Ames, Jr. sued taxicab driver Benjamin Alcindore for assault, battery and intentional infliction of emotional distress (Counts I, II and V) and Yellow Cab of D.C., Inc. ("Yellow Cab") for Alcindore's torts under *respondeat superior,* for negligent hiring and retention (Count III), and for negligent entrustment, supervision and assignment (Count IV). Yellow Cab moved for summary judgment on all claims against it. The magistrate judge prepared a report recommending that Yellow Cab's motion for summary judgment be denied with respect to all claims, to which Yellow Cab objected.  Because the facts taken in the light most favorable to Ames show that a genuine issue of material fact exists regarding whether Yellow Cab was negligent in supervising Alcindore, Yellow Cab's motion for summary judgment will be denied as to that claim.  Because Ames cannot show that Yellow Cab and Alcindore had an employer-employee relationship or that Yellow Cab was negligent in hiring Ames, judgment will be granted to Yellow Cab on the remaining counts.

-2-

BACKGROUND

I.   YELLOW CAB'S RELATIONSHIP TO ALCINDORE

Yellow Cab is a corporation organized under the laws of the District of Columbia that licenses cab owners to use the Yellow Cab colors and logo on the owner's cab and provides an optional dispatch service.  (Def.'s Summ. J. Mot., Ex 2 at 7; Compl. ¶ 13.)  Yellow Cab does not own or operate taxicabs.  In December 1999, Alcindore, a taxicab driver with a hacker's license issued by the D.C. Taxicab Commission, owned his own cab and used the Yellow Cab name, color scheme and emblem under a licensing agreement.  (Def.'s Summ. J. Mot., Ex. 4 ¶ 1.)  To be approved by the D.C. Taxicab Commission ("Commission"), an applicant must have a good driving record, pass a national criminal background check and provide a report from the D.C. Metropolitan Police Department regarding all criminal activity, arrests and convictions.  The Commission may decline to issue a license based on the applicant's criminal background checks.  (Def.'s Summ. J. Mot., Ex. 2 at 7-8.)

A.   Licensing agreement

To be eligible to enter into a license agreement with Yellow Cab, a licensee-driver must have a valid driver's license, own his cab, maintain insurance on it and have a valid hacker's license from the Commission.  (Id., Ex. 1 ¶ 13.)  In exchange for the use of Yellow Cab's colors and emblem, Alcindore paid Yellow Cab a weekly licensing fee.  (Id. ¶ 11.)  Alcindore and Yellow Cab agreed that "[u]nder no circumstances shall the Licensee be deemed to be an employee or agent of the Licensor."  (Id., Ex. 4

-3-

¶ 18.)  In addition, the agreement states that "the Licensor shall not have any right to exercise any control over or to direct in any respect the conduct or management of the Licensee's business or operations."  (Id.)  Alcindore also "agrees to expedite all dispatches accepted by him in a prompt and orderly manner, provided that Licensee, in his sole discretion, shall determine in what zone or zones he shall operate, the hours he shall work and the routes over which he shall expedite such dispatches."  (Id., Ex. 4 ¶ 6(b).)  Alcindore agreed to maintain and repair his vehicle, carry insurance, maintain a valid driver's license, pay the license fee each Saturday for the following week, and abide by all District of Columbia laws and regulations.  (Id., Ex. 4 ¶¶ 5-7.)  Yellow Cab did not receive or have a right to inspect a driver's manifests or record of trips made.  (Id., Ex. 3 at 137.)  The agreement also required that the painting of the cab "shall be done at the Licensor's shop or such other place as it may authorize."  (Id., Ex. 4 ¶ 2.)  Yellow Cab authorized "three or four different places" that would paint the cabs for competitive prices.  (Pl.'s Opp'n, Ex. 4 at 72.) Finally, according to a February 8, 1992 letter, Yellow Cab made

-4-

"[i]t . . . mandatory that drivers check in on all stands."[1]
(Id., Ex. 3.)

B.   Wages

Yellow Cab did not pay Alcindore wages or withhold taxes.
(Def.'s Reply, Ex. 8 at 48.)   Alcindore kept all money paid to
him by his passengers, regardless of how he acquired the
passenger.   (Def.'s Obj. to R&R, Ex. 2 at 54-55.)   Alcindore
could acquire passengers by picking up someone hailing a cab on
the street, through the dispatch system, or through a voucher
system.

C.   Optional services

Yellow Cab provided an optional dispatch service for Yellow
Cab drivers that the drivers did not have to pay for if they did
not want to use it.   (Def.'s Reply, Ex. 8 at 48.)   Additionally,
a driver who used the dispatch system did not have to bid on any
fare on the system.   (Id.)   As Alcindore stated, "If you don't
want to take the job well, you don't bid."   (Pl.'s Opp'n, Ex. 14
at 36.)   Yellow Cab did require, however, that the drivers take
any passenger that they bid on through the dispatch service.
According to Alcindore, "[y]ou have to run the job if you bid on

---

[1]   Ames attaches a letter as an exhibit to prove that Yellow
Cab required drivers to check in at all taxi stands.   (Pl.'s
Opp'n, Ex. 3.)   Yellow Cab notes that Ames offers no evidence
that the instructions proffered in the letter were actually in
effect seven years later during the altercation between Ames and
Alcindore.   (Def.'s Reply at 4-5.)   This letter was issued by
Warren Beverly who was president of Yellow Cab in 1992, while
Yellow Cab's president during the incident in 1999 was Vaughn
Williams.   (Def.'s Summ. J. Mot., Ex. 1 ¶ 2.)   Williams submitted
supplemental affidavits attesting that since 1995, no policy at
Yellow Cab ever required that drivers check in at stands.
(Def.'s Reply, Ex. 9; Def.'s Obj. to the R&R, Ex. 4.)

it [through the dispatch service] and it is assigned to you."
(Id.)  Yellow Cab never issued Alcindore any manual, rules or
guidelines for use of the radio dispatch system.  (Def.'s Reply,
Ex. 8 at 29.)

Yellow Cab also had accounts with several firms in
Washington D.C. where a passenger could ride with a voucher and
Yellow Cab would bill the company at the end of the month.
(Def.'s Obj. to R&R, Ex. 2 at 54.)  The cab driver could take the
voucher into the Yellow Cab office and receive cash for the
amount of the voucher.  (Pl.'s Opp'n, Ex. 10 at 98.)  Vaughn
Williams, Yellow Cab's president, said that Yellow Cab does not
derive any revenue from those revenues that drivers collect from
passengers.  (Def.'s Obj. to R&R, Ex. 2 at 54.)  Williams
acknowledges that Yellow Cab charges a processing fee for the
voucher service (id.), but said that the voucher system is not a
fee-sharing arrangement and that Yellow Cab retains no fee that
the driver is entitled to collect from the passenger.  (Def.'s
Reply, Ex. 9.)[2]

---

[2]   Ames claims that Yellow Cab shares in fees drivers collect
through the voucher service.  (Pl.'s Opp'n at 6-7.)  To support
this claim, Ames cites the deposition of another driver, Rouzbeh
Mazanderan, who stated that when he cashed his vouchers at the
Yellow Cab office, Nathan Price told him that Williams would add
25% to the bill as a tip and keep that amount.  (Id., Ex. 10 at
98-99.)  The next time he had a voucher, Mazanderan crossed out
the area for tips on his voucher, and then Williams asked him not
to write anything in the tips area.  (Id. at 99.)  Mazanderan
testified that Williams' reaction confirmed what Price said,
although Mazanderan admits that he did not ask Williams why he
should not mark an "X" on the tip line.  (Id.)

-6-

D.   <u>Insurance, hours, maintenance</u>

Alcindore paid Yellow Cab for his insurance coverage.   (<u>Id.</u>, Ex. 8 at 19.)   The insurance was provided through Yellow Cab, but it is undisputed that the drivers themselves covered all the associated costs.   (Pl.'s Opp'n, Ex. 5 at 19; Def.'s Obj. to R&R, Ex. 2 at 73.)   In his deposition cited by Ames, Alcindore agreed that he "reimburse[d Yellow Cab] for the payments" to the insurance company.   (Pl.'s Opp'n, Ex. 5 at 19.)   Williams corroborated this characterization when he attested that the drivers' payments of insurance premiums to Yellow Cab are "paid to the insurance company, [and] Yellow Cab just acts as a conduit."   (Def.'s Obj. to R&R, Ex. 2 at 73.)   Furthermore, Yellow Cab allowed drivers to choose their insurance, indicating that a small percentage of cab drivers were insured through APCO Insurance Agency.   (Def.'s Summ. J. Mot., Ex. 3 at 67.)

Yellow Cab was not involved in other aspects of the drivers' business.   Drivers set their own hours, worked in the areas of their choice (Def.'s Reply, Ex. 8 at 58), maintained and repaired their own vehicles (Def.'s Summ. J. Mot., Ex. 4 ¶ 6(c)), maintained their own manifest (<u>id.</u>, Ex. 3 at 137), and kept all of their own fares.   (Def.'s Obj. to R&R, Ex. 4.)

E.   <u>Discipline and termination</u>

Yellow Cab has the power to discipline drivers by banning them from using the dispatch system.   (Pl.'s Opp'n at 6.)   In one instance, Mazanderan, a driver, was barred from using the dispatch radio system for 60 days after a passenger complained that the driver was rude.   (<u>Id.</u>, Ex. 6 at 69.)   As the licensing

agreement states, Yellow Cab also had the authority to terminate
an agreement with a driver.  (Def.'s Summ. J. Mot., Ex. 4 ¶ 10.)
Williams indicated that if a driver had a number of complaints
against him, Williams would have an individual conference with
the driver, and if a driver received too many complaints, the
driver's agreement would be terminated.  (Pl.'s Opp'n, Ex. 7
at 131.)  When Yellow Cab terminated the agreement with
Mazanderan, Williams stated that he "decided to terminate the
Licensing Agreement between [Mazanderan] and Yellow Cab" and that
Mazanderan was "required to remove the color scheme, trade name
and cruising light" from his cab.  (Id., Ex. 9.)  Such a
termination has the effect only of preventing a driver from using
the Yellow Cab colors and emblem.  Yellow Cab could not prevent
anyone with a valid hacker's license from doing business as a
taxicab driver in the District of Columbia.  (Def.'s Summ. J.
Mot., Ex. 1 ¶ 8.)

F.   Knowledge of guns in cabs

Mazanderan never saw a gun in a Yellow Cab, and did not know
Alcindore or if Alcindore carried a gun in his cab. (Def.'s Summ.
J. Mot., Ex. 6 at 128.)  However, according to Mazanderan, he
told Williams prior to the termination that some drivers carry
guns in their cabs, and  Williams said that he did not care.
(Pl.'s Opp'n, Ex. 11 at 125.)  Williams does not recall this
conversation and denies knowing that Yellow Cab drivers carried
guns.  (Def.'s Summ. J. Mot., Ex. 3 at 109-11.)  Williams said
that he was unaware that Alcindore was dangerous or had violent
tendencies (id., Ex. 1 ¶ 15) and thought that Alcindore was an

"absolutely outstanding cab driver" based on his lack of complaints. (<u>Id.</u>, Ex. 3 at 62.)

II.  ALCINDORE'S ALLEGED TORTIOUS CONDUCT

On December 22, 1999, Ames, a Georgetown University employee, was driving his car in front of Alcindore's taxicab on the Georgetown University campus.  (Def.'s Summ. J. Mot., Ex. 5 at 3-4; Pl.'s Opp'n at 2.)  Alcindore's taxicab was marked with Yellow Cab's trade name and color scheme.  (Def.'s Stmt. Fact ¶ 7; Pl.'s Opp'n at 2.)  Because Alcindore was driving his taxicab erratically, Ames stopped his car, confronted Alcindore who remained in his taxicab, and attempted to obtain from inside the taxicab Alcindore's taxicab licensing documents.  (Def.'s Stmt. Fact ¶ 20; Def.'s Summ. J. Mot., Ex. 5 at 3-4; Pl.'s Opp'n at 2.)  Ames reached into Alcindore's taxicab several times. (Defs.' Stmt. Fact ¶ 21; Pl.'s Opp'n at 2.)  Alcindore retrieved a gun he had in his cab, shot Ames three times at close range, and fled the scene.  (Pl.'s Opp'n at 3.)  As a result of the gunshot wounds, Ames suffered severe and permanent paralysis.

## DISCUSSION

The magistrate judge's report and recommendation is reviewed de novo.  LCvR 72.3(c); <u>see</u> <u>also</u> Fed. R. Civ. P. 72; <u>Fontana v. Caldera</u>, 160 F. Supp. 2d 122, 126 (D.D.C. 2001).  Summary judgment will be granted if the evidence, viewed in the light most favorable to the nonmoving party, indicates that there is no issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284, 1288 (D.C. Cir. 1998).  As

-9-

the movant, Yellow Cab carries the initial burden of identifying
evidence that demonstrates the absence of a genuine issue of
material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).

I.   EXISTENCE OF AN EMPLOYER-EMPLOYEE RELATIONSHIP

     To establish each of his vicarious liability claims against
Yellow Cab, Ames must demonstrate (a) the existence of an agency
relationship between Alcindore and Yellow Cab, and (b) that
Alcindore was acting within the scope of his employment.  Judah
v. Reiner, 744 A.2d 1037, 1039-40 (D.C. 2000).  Employers are
generally liable for employee torts that are committed within the
scope of employment.  Wilson v. Good Humor Corp., 757 F.2d 1293,
1301 (D.C. Cir. 1985).  In determining whether an employer-
employee relationship exists, the factors to consider include:
"(1) the selection and engagement of the servant, (2) the payment
of wages, (3) the power to discharge, (4) the power to control
the servant's conduct, (5) and whether the work is part of the
regular business of the employer."  Judah, 744 A.2d at 1040
(citing LeGrand v. Ins. Co. of N. Am., 241 A.2d 734, 735 (D.C.
1968)).  The employer's right to control and direct the daily
activities of the employee is usually considered "the
determinative factor."  District of Columbia v. Hampton, 666 A.2d
30, 38 (D.C. 1995) (citing Safeway Stores, Inc. v. Kelly, 448
A.2d 856, 860 (D.C. 1982)).  The party asserting the employer-

-10-

employee relationship has the burden of proving it.  <u>Hampton</u>, 666

A.2d at 38.[3]

A.   <u>Control</u>

"The decisive test . . . is whether the employer has the

right to control and direct the servant in the performance of his

work and the manner in which the work is to be done."  <u>LeGrand</u>,

241 A.2d at 735 (emphasis omitted) (quoting Dovell v. Arundel

Supply Corp., 361 F.2d 543, 544 (D.C. Cir. 1966)).  In analyzing

the employer's "right to control," the court looks at the intent

of the parties, as reflected in any contract between them, and

the actual relationship.  <u>Hampton</u>, 666 A.2d at 39.

The contract between Alcindore and Yellow Cab stated that

"the intention of the parties hereto is that the Licensee shall

at all times be an independent contractor and independent

businessman" and "[u]nder no circumstances shall the Licensee be

deemed to be an employee or agent of the Licensor."  (Def.'s

Summ. J. Mot., Ex. 4 ¶ 18.)  In addition, the agreement states

---

[3]      "The general rule is that . . . an association or company
'which neither owns nor operates cabs and has no control over
their operation is not responsible for the negligence of a
[driver] in operating his cab.'"  <u>Wood v. Barwood Cab Co.</u>, 648
A.2d 670, 672 (D.C. 1994) (quoting <u>Harlem Taxicab Ass'n v.
Nemesh</u>, 191 F.2d 459, 461 (D.C. Cir. 1951)).  "An association's
name and insignia raise a presumption that it owns or controls a
cab on which they appear, but this is decisive only in the
absence of contrary evidence.  When substantial evidence contrary
to a presumption is introduced, the underlying facts that
originally raised the presumption may or may not retain some
degree of probative force as evidence but they no longer have any
artificial or technical force; in other words, 'the presumption
falls out of the case.'"  <u>Nemesh</u>, 191 F.2d at 461 (internal
citations omitted).  Because of the substantial evidence
discussed in this opinion that Yellow Cab does not own and
control cabs bearing its logo and colors, the presumption falls
out of this analysis.

that "the Licensor shall not have any right to exercise any
control over or to direct in any respect the conduct or
management of the Licensee's business or operations."  (Id.)
However, the intent to create an employer-employee relationship
is more likely to prove such a relationship than the express
intent to prevent an employee-employer relationship will prove
the lack of an employee-employer relationship.  Redd v. Summers,
232 F.3d 933, 939 (D.C. Cir. 2000).  Therefore, even though the
contract between Alcindore and Yellow Cab indicates an intent to
establish an independent contractor relationship, it is not
dispositive on the existence of an employee-employer
relationship.

An employer-employee relationship can be shown when the
employer has control over the day-to-day operations of the
alleged employee and can direct the manner in which the work is
performed.  See, e.g., LeGrand, 241 A.2d at 735 (finding a
master/servant relationship between contractor and a painter
where the contractor controlled the painter's conduct through
repeated contacts and by designating the methods that painter was
to use, such as using the blowtorch method); Safeway, 448 A.2d
at 861-62 (holding that a guard working at Safeway through a
security service was an employee of the store where the store
manager asked the guard (1) to lock the doors, (2) to help the
manager if there was a problem with a customer, (3) to keep
juveniles out of doorways and watch for shoplifters, and (4) to
assist him during the incident in question).  The right to set
standards, however, is not an indicium of control.  See, e.g.,

Giles v. Shell Oil Corp., 487 A.2d 610, 611-13 (D.C. 1985)
(holding no agency relationship between Shell Oil and the
attendant who fatally shot plaintiffs' son where Shell Oil owned
the service station, paid for repairs on the premises, set the
standards by which the station was to be operated, had the right
to inspect the station and had the right to terminate the lease
agreement if the operator failed to maintain the station
according to specified standards but did not "have the right to
control the day-to-day operations of the station and its
employees"); Moorehead v. District of Columbia, 747 A.2d 138, 145
(D.C. 2000) (holding that the District's regulations outlining
special police officers' uniforms and their duties do not
establish control); Hampton, 666 A.2d at 40 (holding that various
rules and regulations concerning foster homes do not indicate
that the city had actual control over the foster parent).

Each cab driver controlled his own work day by setting his
own schedule, and deciding in which areas he would work.  (Def.'s
Reply, Ex. 8 at 58.)  Alcindore could work anytime of day and in
any part of town.  He was free to pick up passengers on the
street, acquire passengers through the dispatch system or pick up
voucher passengers.  Although, as Ames points out, Alcindore was
required to pick up the fares that he bid on through the dispatch
service (Pl.'s Opp'n at 6), drivers were not required to bid on a
job in the first place or even use the dispatch system at all.
As Alcindore stated, "[i]f you don't want to take the job well,
you don't bid."  (Id., Ex. 14 at 36.)  Furthermore, once a driver
picked up the fare, "that Licensee, in his sole discretion, shall

-13-

determine . . . the routes over which he shall expedite such dispatches." (Def.'s Summ. J. Mot., Ex. 4 ¶ 6(b).)  Yellow Cab did not receive or have a right to inspect a driver's manifests or record of trips made.[4]  (Def.'s Summ. J. Mot., Ex. 1 ¶ 9; id., Ex. 3 at 137.)

Yellow Cab's right to ban drivers from using the dispatch system is not evidence of Yellow Cab control over Alcindore's daily taxi operations.  Mazanderan was barred from using the dispatch radio system for 60 days, but no evidence indicates that he was unable to pick up passengers who hailed his cab on the street.  Because the use of the dispatch system was voluntary, a ban on using the system would not prevent a driver from continuing to operate his taxi under the Yellow Cab name.

Ames' evidence that Yellow Cab manipulated the voucher system to be a fee-sharing arrangement between Yellow Cab and the drivers does not establish Yellow Cab's control over the drivers.  The drivers with vouchers were paid the money owed to them on demand and the drivers were free to choose whether or not to pick up a voucher fare.  No driver was required to take a voucher fare.

---

[4]    The February 8, 1992 letter indicating that "[i]t is mandatory that drivers check in on all stands" does not establish that Yellow Cab had any right to control Alcindore's daily operations.  (Pl.'s Opp'n, Ex. 3.)  Although Ames gives no context to this command, it is not reasonable to infer that each cab was required to check in at a stand every day that the cab was operating.  The only reasonable inference would be that if a driver chose to wait at a Yellow Cab stand, he would be required to check in with the Yellow Cab dispatcher; a driver who chose not to utilize a cab stand to acquire passengers would not be required to check in.

-14-

That Yellow Cab gave the cab drivers competitive options on various requirements of their contracts further indicates that Yellow Cab did not control the drivers' activities.  Yellow Cab did not provide the insurance for its taxicab drivers, as Ames claims because the drivers merely paid the insurance through the Yellow Cab office.  (Pl.'s Opp'n, Ex. 5 at 19.)  The drivers had a choice of which agency would provide their insurance and were not limited to using only agencies Yellow Cab selected.  (Def.'s Summ. J. Mot., Ex. 3 at 67.)  Also, drivers could have their cabs painted with the Yellow Cab colors and emblem at three or four authorized shops, which were competitively priced.  (Id., Ex. 4 ¶ 2; Pl.'s Opp'n, Ex. 4 at 72.)

It is undisputed that Alcindore owned the cab he was driving in December 1999, that he was solely responsible for the maintenance and repair of the vehicle, that he was required to pay Yellow Cab a weekly licensing fee, and that he alone chose his routes, his fares, and his schedule.  Nothing Ames has presented indicates that Yellow Cab controlled Alcindore's day-to-day operation of his cab.

B.   Other factors

The other relevant factors in determining whether an employer-employee relationship existed include selection and engagement of the employee, the payment of wages, the power to discharge, and whether the work is part of the regular business of the employer.  Ames has not shown that these factors indicate an employer-employee relationship between Alcindore and Yellow Cab.

-15-

Yellow Cab does not hire the drivers to drive taxicabs. Instead, it licenses its name, logo and optional services to them.  To be eligible to enter into a license agreement with Yellow Cab, the licensee driver must have a valid driver's license, own his or her cab, maintain insurance on it and have a valid hacker's license from the D.C. Taxicab Commission.  (Def.'s Summ. J. Mot., Ex. 1  ¶ 13.)  Cf. LeGrand, 241 A.2d at 735 (determining that a master-servant relationship existed between a contractor and painter because, among other reasons, the contractor selected the painter); Safeway, 448 A.2d at 861 (noting that the fact that Safeway hired the guard to work on a continuous basis was a factor in finding an employer-employee relationship between the store and the guard).

Generally, payment of wages supports a finding that an employer-employee relationship exists.  See Safeway, 448 A.2d at 861 (determining that paying for the guard's services on a monthly basis in a lump sum to the security service was a factor indicating that the store employed the guard); Moorehead, 747 A.2d at 144 (finding that corporations paying wages to special police officers suggests an employer-employee relationship). According to Yellow Cab, it does not pay wages or any other form of compensation to any of the cab drivers.[5]  (Def.'s Summ. J.

_____

[5]     In his statement of genuine issues filed in opposition to the motion, plaintiff disputes this assertion.  (Pl.'s Opp'n, Stmt. Issues ¶ 11.)  However, he has not complied with LCvR 56.1 by providing any factual evidence to support the disputed claim. He has failed, then, to raise a genuine issue of material fact. See, e.g., MAPCO Int'l Inc. v. Fed. Energy Regulatory Comm., 783 F. Supp. 639, 646 n.47 (D.D.C. 1992) (noting that to establish a genuine dispute, a party opposing summary judgment must offer

-16-

Mot., Ex. 1 ¶ 6.)  Even if Yellow Cab succeeds in extracting revenue from voucher fares, that neither reduces a driver's revenue expectation nor creates a wage system suggestive of an employer-employee relationship.  Moreover, the voucher fare system remains a voluntary one from which drivers are free to opt out.

The power to discharge suggests an employer-employee relationship.  See LeGrand, 241 A.2d at 735 (finding that a contractor's power to dismiss a painter supported an employer-employee relationship); Safeway, 448 A.2d at 861 (determining that an agency relationship existed between Safeway and the guard where the store had the right to discharge the individual guard, subject to the security service's approval).  Although Yellow Cab can terminate licenses based on various complaints filed against a driver (Pl.'s Opp'n, Ex. 8 at 76; id., Ex. 9), and the license agreement between Alcindore and Yellow Cab states that their relationship could be "terminated by either party at any time" (Def.'s Summ. J. Mot., Ex. 4 ¶ 10), Yellow Cab's termination would have the effect only of preventing the driver from using the Yellow Cab colors and emblem.  (Pl.'s Opp'n, Ex. 9.)  Because Yellow Cab cannot prevent a driver from operating his cab and working as a cab driver, this factor does not suggest an employee-employer relationship.

---

evidence to contest the movant's factual allegations, not merely deny them); Int'l Union, UAW v. Nat'l Right to Work Legal Def. and Educ. Found., Inc., 584 F. Supp. 1219, 1223 (D.D.C. 1984) (holding that to survive a motion for summary judgment, plaintiffs must provide factual evidence to dispute defendant's recitation of material facts and sworn testimony).

-17-

Where work performed by an individual is part of the regular business of the employer, an agency relationship is suggested. Cf. Giles, 487 A.2d at 612 (finding no agency relationship existed between Shell Oil and the attendant who leased the station, where Shell was in the business of leasing the premises and the attendant's work consisted of operating the service station). Yellow Cab is in the business of leasing the Yellow Cab name and colors to individually-owned cab drivers in return for a weekly fee. (Def.'s Summ. J. Mot., Ex. 1 ¶ 11; id., Ex. 4 ¶ 1.) The drivers, in turn, operate the taxis. Because operating cabs is not part Yellow Cab's regular business, this factor does not weigh in favor of an employer-employee relationship.

The facts do not show that Alcindore and Yellow Cab had an employer-employee relationship. Yellow Cab cannot be held vicariously liable for Alcindore's torts, then, and summary judgment will be granted to Yellow Cab for assault, battery and intentional infliction of emotional distress.[6]

---

[6]    In his opposition to Yellow Cab's motion for summary judgment, Ames asserts for the first time a claim that as an independent contractor, Yellow Cab is liable for the assault and battery he suffered. (Pl.'s Opp'n at 13.) Because plaintiff has not submitted a motion for leave to amend his complaint under Fed. R. Civ. P. 15(a) or shown good cause as to why this substantive claim should be added at this stage of the proceedings, his independent contractor claim will not be considered in opposition to the defendant's motion for summary judgment. See Armstrong v. Reno, 172 F. Supp. 2d 11, 24 (D.D.C. 2001). Even if this claim were properly before the court, Yellow Cab would not be liable for Alcindore's intentional torts committed as an independent contractor. Because Ames has not established that an employer-employee relationship existed between Yellow Cab and Alcindore, Yellow Cab cannot be found vicariously liable for assault and battery. See Brown v.

II.  NEGLIGENT HIRING AND RETENTION, AND NEGLIGENT ENTRUSTMENT,
     SUPERVISION AND ASSIGNMENT

     Plaintiff also claims that Yellow Cab is liable for
negligent hiring and retention (Count III) and negligent
entrustment, supervision and assignment (Count IV).

     A.    Negligent hiring and retention

     A "contractor's negligence in conducting the work it was
hired to do creates no presumption that the employer was
negligent in selecting the contractor." Fry v. Diamond
Construction, Inc., 659 A.2d 241, 248 (D.C. 1995) (quoting
Sullivan v. St. Louis Station Assocs., 770 S.W.2d 352, 356 (Mo.
App. 1989)).  However, "an employer has 'the legal duty to use
ordinary care so as not to employ or retain an independent
contractor-carrier it knew or should have known was . . .
negligent in performing the contract.'" Fry, 659 A.2d at 248
(quoting Jones v. Sw. Newspapers Corp., 694 S.W.2d 455, 458 (Tex.
App. 1985)).  An employer cannot be liable for negligent hiring
if the employer conducts a reasonable investigation into the
person's background or if such an investigation would not have
revealed any reason not to hire that person.  See, e.g., Fry, 659
A.2d at 248 (finding that a general contractor was not negligent
in initially hiring the painting subcontractor where the general
contractor's safety officer previously worked with subcontractor
on similar projects and was reasonably assured of the

_____

Argenbright Sec., Inc., 782 A.2d 752, 759 (D.C. 2001) (holding
that absent proof of a master-servant relationship, grocery store
was not vicariously liable for independent contractor's
intentional torts).

-19-

subcontractor's reputation for safety and competent work);

<u>Fleming v. Bronfin</u>, 104 A.2d 407, 408 (D.C. 1954) (holding that a grocery store was not negligent in hiring a deliveryman who assaulted a woman while delivering her order even though the store only called the deliveryman's previous employer before hiring him because a more thorough investigation would not have revealed that the deliveryman would be likely to assault women).

Yellow Cab does not perform any background checks on potential licensees, but instead relies on the Commission's investigations conducted before hacker's licenses are issued. (Def.'s Summ. J. Mot., Ex. 3 at 25.)  To be approved by the Commission, an applicant must have a good driving record, pass a national criminal background check and provide a report from the D.C. Metropolitan Police Department regarding all criminal activity, arrests and convictions.  (<u>Id.</u>, Ex. 2 at 7-8.)  The Commission may decline to issue a license based on the applicant's criminal background.  (<u>Id.</u>)  Because Alcindore had a valid hacker's license, Yellow Cab reasonably relied on the Commission's background check and had no duty to further inquire about his criminal background.  (<u>See</u> <u>id.</u>, Ex. 4 at 1 (noting that Alcindore is duly licensed to drive a taxicab by the District of Columbia in the licensing agreement signed by Alcindore and Yellow Cab president).)  Additionally, Ames does not provide any evidence to suggest that if Yellow Cab did undertake an independent investigation of Alcindore before entering into a licensing agreement with him, the resulting information would have put Yellow Cab on notice of any violent tendencies by

Alcindore.  Therefore, Yellow Cab cannot be held liable for
negligent hiring and retention of Alcindore.

    B.   <u>Negligent entrustment, supervision and assignment</u>

    To establish a prima facie case for negligent entrustment,
supervision and assignment, Ames must demonstrate that Yellow Cab
"knew or should have known [Alcindore] behaved in a dangerous or
otherwise incompetent manner, and that [Yellow Cab], armed with
that actual or constructive knowledge, failed to adequately
supervise [Alcindore]."[7] <u>Phelan v. City of Mount Rainer</u>, 805
A.2d 930, 937-38 (D.C. 2002) (internal citation omitted); <u>see
also</u> <u>Fry</u>, 659 A.2d at 248 (finding a genuine issue of material
fact as to whether a contractor was negligent in retaining and
supervising a subcontractor after the contractor was informed
that a dangerous procedure would be used).  Ames is not required
under this theory of liability to show that Alcindore was a
Yellow Cab employee.  <u>Brown v. Argenbright Sec., Inc.</u>, 782 A.2d
752, 760 n. 11 (D.C. 2001) ("[A] claim of negligent supervision
does not require proof that the supervised person was also an
employee or agent."); <u>accord</u> <u>Mitchell v. DCX, Inc.</u>, 274 F. Supp.
2d 33, 51 n.14 (D.D.C. 2003) (noting that even if the term

---

[7]    The Restatement (Second) of Agency § 213 defines negligent
supervision as follows: "A person conducting an activity through
servants or other agents is subject to liability for harm
resulting from his conduct if he is negligent or reckless:
(a) in giving improper or ambiguous orders or in failing to make
proper regulations; or (b) in the employment of improper persons
or instrumentalities in work involving risk or harm to others;
(c) in the supervision of the activity; or (d) in permitting, or
failing to prevent, negligent or other tortious conduct by
persons, whether or not his servants or agents, upon premises or
with instrumentalities under his control."

"employee" is frequently used in discussing the standard for
negligent supervision, the Restatement of Agency and other
authorities do not demand that the supervised individual be an
employee).  Indeed, the duty of care under the negligent
supervision standard "extends to activities which . . .
[sometimes] are outside of the scope of employment."  Murphy v.
Army Distaff Found., Inc., 458 A.2d 61, 63 (D.C. 1983) (internal
citation omitted).

Yellow Cab carefully controls the use of its logo and
colors.  It derives revenue from the licensing fees linked to the
use of its logo and colors in taxicab operations.  Mazanderan
said he told Yellow Cab's president that some cab drivers carried
guns and that the president voiced indifference in response.  If
true, Yellow Cab owed a duty to the plaintiff to make a
reasonable inquiry as to whether drivers -- who displayed the
face of the company to the public and supplied the company's fee
revenues -- carried guns in the process, and it owed a duty to
prevent the dangers posed by drivers carrying them.  Williams'
denial that the exchange occurred and that he was on notice that
drivers may be armed creates a genuine dispute of material fact
bearing on whether Williams breached a duty to investigate.  See
Fry, 659 A.2d at 248 (holding that once the general contractor
was aware of the unsafe practice, he "'was in duty bound to
investigate whether [the subcontractor] in fact was competent and
properly equipped to continue in the work and to take steps to
avert any existing peril if [the subcontractor] were not
competent, or improperly equipped to carry on the work'" (quoting

Kuhn v. P.J. Carlin Constr. Co., 278 N.Y.S. 635, 644 (N.Y. Sup.
Ct. 1935))).  Yellow Cab, then, is not entitled to summary
judgment on the negligent entrustment, supervision and assignment
claim.

Viewing the evidence in the light most favorable to Ames,
Yellow Cab is entitled to judgment as a matter of law on the
negligent hiring and retention claim, but not the negligent
entrustment, supervision and assignment claim.  Therefore, Yellow
Cab's motion for summary judgment as to negligent hiring and
retention will be granted and Yellow Cab's motion for summary
judgment as to negligent entrustment, supervision and assignment
will be denied.

CONCLUSION AND ORDER

Alcindore was not Yellow Cab's employee, and Yellow Cab
cannot be held vicariously liable for Alcindore's torts or be
found negligent for hiring and retaining Alcindore.  A genuine
issue of material fact does exist, however, concerning whether
Yellow Cab was aware of a potential danger posed by drivers that
it had a duty to investigate and avert.  Therefore, summary
judgment will denied as to the negligent entrustment, supervision
and assignment claim and granted to Yellow Cab as to the
remaining claims.  Accordingly, it is hereby

ORDERED that summary judgment be, and hereby is, GRANTED in
part and DENIED in part.  Summary judgment is denied as to the
negligent entrustment, supervision and assignment claim and
GRANTED to Yellow Cab on all remaining counts.

-23-

SIGNED this 21st day of September, 2006.

<u>           /s/                </u>
RICHARD W. ROBERTS
United States District Judge